

Villanova University School of Law

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-4-2005

# Leia v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-2420

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Leia v. Atty Gen USA" (2005). *2005 Decisions.* Paper 1544.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1544

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

─────

No. 03-2420

─────

IGOR LEIA,
Petitioner

v.

JOHN ASHCROFT,
ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

─────

Petition for Review of an Order
of the Board of Immigration Appeals
(A73 535 070)

─────

Argued October 5, 2004

Before: SLOVITER, BECKER, and STAPLETON, Circuit
Judges

(Filed January 4, 2005)

─────

Valentine A. Brown (Argued)
Valentine Brown, LLC
Suite 3-A
3 South Broad Street
Woodbury, N.J.  08096

       Attorney for Petitioner

Peter D. Keisler
       Assistant Attorney General Civil Division

Emily A. Radford
        Assistant Director
James A. Hunolt
Douglas E. Ginsburg
John D. Williams
Jennifer J. Kenney (Argued)
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P. O. Box 878
Washington, D.C.  20044

        Attorneys for Respondent


OPINION OF THE COURT


SLOVITER, Circuit Judge.

Igor Leia[1] petitions this court for review of an order of the Board of Immigration Appeals (BIA) dated April 14, 2003 dismissing his appeal from the order of the Immigration Judge (IJ) denying his application for asylum and withholding of removal.  Leia argues, inter alia, that the BIA abused its discretion in affirming the IJ's refusal to admit the documentary evidence that he proffered following remand of the case because it had not been authenticated in the manner required by 8 C.F.R. § 287.6, the primary factor contributing to an adverse credibility determination.  App. at 50.  The BIA's 2003 dismissal order

---

[1]  Leia's former wife also entered the United States and petitioned for asylum.  Although some of the underlying agency proceedings concerned both Leia and his wife, they subsequently divorced, whereupon she remarried a United States citizen which resulted in her asylum case being severed from his.  We thus will not discuss the underlying agency proceedings as they related to her.

2

stated, <u>inter alia</u>, "Based on the lack of authenticated collaborating documentation, we find that the respondent failed to meet his burden of proof." <u>Id.</u> Because this court has recently issued an opinion interpreting the authentication requirement in 8 C.F.R. § 287.6, <u>see</u> <u>Liu v. Ashcroft</u>, 372 F.3d 529 (3d Cir. 2004), an opinion that was not available to either the IJ or the BIA at the time of their respective decisions, we will grant Leia's petition for review, vacate the BIA's order, and remand.

## I.

Leia is a Ukrainian citizen of Polish descent. According to him, non-ethnic Ukrainians living in the Ukraine like himself are treated differently than ethnic Ukrainians. In the agency proceedings, he argued that because he is not of Ukrainian ancestry he was often subject to ridicule and was repeatedly denied job promotions. Leia testified that in order to combat this discrimination he joined a political organization called the United National Front (UNF), whose goals are to promote the rights of non-ethnic Ukrainians within the Ukraine. A.R. 279. As a member of this organization, Leia would attend meetings, hand out information in the streets and squares of the city of his residence, and correspond with UNF organizations in other cities. App. at 124-25.

Leia testified that during a UNF meeting on December 12, 1993, he was beaten by members of the Organization of Ukrainian Nationalists and the Ukrainian Revolutionary Army (Nationalistic Party), a conglomerate ultra-nationalist group.[2] According to Leia, he was struck in the head with a pair of brass knuckles – an attack that left a scar. He further stated that instead of arresting the members of the Nationalistic Party who had started the fight, the authorities arrested him and other "victims" of the altercation. Leia was then incarcerated for over twenty-four hours, and claims that while in police custody, he

---

[2] The record suggests that the Organization of Ukrainian Nationalists is the political wing of this group and the Ukrainian Revolutionary Army is the paramilitary force used to further this group's aims. App. at 97.

3

was further beaten and insulted. App. at 154. Indeed, Leia claimed that when he asked the arresting officers why his attackers had not been apprehended, the officers replied caustically and stated that "if '[y]ou want trouble, we will give you trouble.'" App. at 126. Following his release, Leia filed a complaint with the prosecutor's office but stated that he never received a response. Id.

After this incident, Leia began getting bi-weekly calls and threats at home from people demanding that he stop his political activities and suggesting that he leave the Ukraine. App. at 126-27. He further claims to have received notes containing similar threats. Then, while Leia was walking home on March 13, 1994, he was beaten on the street by members of the Nationalistic Party. During this attack, his assailants taunted him: "'remember we warned you to stop, but you did not listen.'" App. at 127. As a result of this assault, he suffered multiple contusions and bruising all over his neck and body, a concussion, and longer-term injury to his brain.[3]

Approximately two months later, he and his wife were both attacked and beaten by a group of apparent ultra-nationalists in the yard in front of their apartment. App. at 128. Leia was beaten with a metal bat and again sustained a concussion; further, his wife, who was pregnant at the time, suffered a miscarriage. He and his wife were then taken to the hospital. After they were released, his wife filed a complaint with the authorities, but once again no action was taken in response to this complaint. App. at 128. Fearing that he would be subject to future beatings and acts of persecution, Leia came

---

[3] In the statements he submitted with his original asylum application, as well as in his 1995 testimony before the IJ, Leia contended that this assault occurred on March 18, rather than March 13, 1994. App. at 147; A.R. 303. Passport records, however, indicate that Leia was in Poland on that date. Although Leia would later offer a plausible reason for this discrepancy, the IJ, as discussed infra, based her adverse credibility finding, at least in part, on this inconsistency.

4

to the United States and, within a year of his arrival, sought asylum. App. at 155.

After reviewing Leia's claim, the IJ held that he was not eligible for asylum. The IJ, in an oral decision dated November 7, 1995, based her decision on the issue of credibility, stating she had "grave misgivings" regarding the credibility of Leia, on the lack of "objective facts in support of the application," and on the fact that the United State's Department of State country reports, profiles, and advisory opinions indicated that Leia could live in other areas in the Ukraine without experiencing persecution. App. at 147-49. The IJ's credibility determination in turn was primarily based on Leia's failure to obtain original documents from the various Ukrainian governmental authorities and on the fact that the facsimile copies he did obtain were not properly authenticated pursuant to 8 C.F.R. § 287.6. App. at 148. In fact, because Leia had failed to authenticate the foreign documents pursuant to the protocols delimited in 8 C.F.R. § 287.6, the IJ sustained an objection to those documents lodged by the Immigration and Naturalization Service (INS)[4] and refused to enter them into evidence.

In addition to the authentication of documents issue and Leia's resultant inability to provide documentary support for his averments, the IJ noted two inconsistencies in Leia's testimony which she found troubling and which affected her credibility determination. The first inconsistency concerned the date of the second beating. Although Leia testified that the second beating occurred on March 18, 1994, the IJ noted that his passport shows that he was in Poland on this date. App. at 147.

---

[4] Effective March 2003, the INS ceased to exist as an independent agency within the United States Department of Justice and its functions were transferred to the newly formed United States Department of Homeland Security. The BIA, however, remains within the Department of Justice. See Knapik v. Ashcroft, 384 F.3d 84, 86 n.2 (3d Cir. 2004) (citing Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451, 471, 116 Stat. 2135 (2002)).

The second inconsistency in Leia's testimony to which the IJ referred concerned the legal status of the UNF. At various times in his testimony, Leia referred to the organization as legal and at other times he described it as illegal. According to Leia, the UNF had applied for legalization but had not received papers indicating that it was legal or illegal. He testified that because the UNF had never received papers saying it was illegal he believed the UNF not to be illegal. A.R. 300-01. At another portion of his testimony, petitioner stated that he could not obtain proof of his membership in the UNF because these would be "'illegal papers.'" App. at 147. The IJ stated that this testimony was internally inconsistent.

Lastly, the IJ determined that Leia's testimony regarding his need for asylum was contradicted by the Department of State advisory opinions and the country reports on human rights for 1994 which indicated that there were areas in the Ukraine where petitioner would be able to live without experiencing persecution. On these bases, the IJ found that petitioner's testimony regarding his need for asylum was not credible and denied his request for asylum. App. at 148-50.

On appeal, the BIA focused on the IJ's decision sustaining the INS's objections to the unauthenticated facsimile documents. The BIA pointed out that the INS was provided with the evidence approximately two months before the hearing but failed to notify the Leias of its objections until the hearing. Noting the importance of the documents, the BIA determined that the Leias "should be given further opportunity to authenticate their evidence and have it considered." App. at 140.

Sometime thereafter, Leia filed an affidavit directed to the discrepancy noted by the IJ as to the date of the second beating. Leia explained that he had not remembered the date he was attacked so he relied on the certificate from the hospital, which was apparently incorrect. Subsequently, he obtained a corrected version of the hospital record, which confirmed March 13, 1994 as the date of the second attack. He proffered the affidavit and the corrected version of the hospital record. It is not clear from the record what weight, if any, the IJ accorded this affidavit in

6

the subsequent remand.

As directed by the BIA, the IJ held additional hearings respecting Leia's asylum petition. After granting several continuances in order to afford Leia an opportunity to authenticate the documents, the IJ held a merits hearing on July 13, 1998. At this hearing, Leia presented the testimony of Professor Peter Stavrakis who the parties stipulated was an expert in Ukrainian politics. App. at 59. Professor Stavrakis testified regarding the current political situation in the Ukraine and explained why he believed Leia would be unable to obtain authenticated documents in the political climate at that time. App. at 59-90.

At the conclusion of the July 13, 1998 hearing, the IJ issued an oral decision. The IJ dismissed the testimony of Professor Stavrakis as irrelevant because she concluded he was not an expert on authentication. App. at 51. She reiterated her concern about the failure to provide authenticated documents, noting that even though Leia had been granted two continuances on the remand totaling over a year in order to afford him sufficient time to obtain authentication, he had failed to do so. A.R. 79, 83. She stated that Leia:

> was given an opportunity to provide to this Court properly authenticated documents which had been found inadmissible for lack of proper authentication pursuant to 8 C.F.R. [§] 287.6 and on remand the respondent has again failed to provide the authentication necessary and the decision of the Immigration Court provided on November 7, 1995, is adopted herein once more.

App. at 52-53. Leia appealed and this time, the BIA affirmed. In its decision dated April 14, 2003, it stated:

> Based on the lack of authenticated collaborating documentation, we find that the respondent failed to meet his burden of proof. . . . In the present case, the respondent attempted to

proffer documents to corroborate his claim that he
had been subject to physical abuse, had filed police
reports, and had received corresponding medical
treatment (Exhs. 6-8, and 13-14, marked for
identification only). The documents which the
respondent submitted were copies transmitted by
facsimile. Although we accorded the respondent
an opportunity to authenticate the documents, the
respondent failed to provide evidence that he
attempted to comply with the regulations . . . .
Instead, he attempted to explain why it would be
unreasonable to expect compliance. The existence
of such corroborating documentation is
undisputed. The absence of authenticated
corroborating documentation is also undisputed.
For the reasons set forth in the Immigration Judge
July 13, 1998, decision, we find that the
respondent failed to demonstrate that it would be
unreasonable to expect authentication of the
corroborating documentation in the instant case....

In sum, we agree with the Immigration
Judge's conclusion that the respondent failed to
put forth sufficient credible testimony in support of
his persecution claim. The respondent thus failed
to establish eligibility for asylum and withholding
of deportation. . . . Accordingly, the appeal is
dismissed.

App. at 50. Leia thereafter lodged this timely petition for
review.

## II.

We have jurisdiction to review final decisions of the BIA
under 8 U.S.C. § 1252. An agency's interpretation of its own
regulation – such as 8 C.F.R. § 287.6 – is controlling unless "it is
plainly erroneous or inconsistent with the regulation." Liu v.
Ashcroft, 372 F.3d 529, 532 (3d Cir. 2004) (internal citations
and quotations omitted). We review agency findings of fact to
ensure that they are supported by substantial evidence. Dia v.

8

Ashcroft, 353 F.3d 228, 247-48 (3d Cir. 2003) (en banc). The substantial evidence standard requires us to determine whether the agency's finding of fact are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Balasubramanrim v. Immigration & Naturalization Serv., 143 F.3d 157, 161 (3d Cir. 1998) (internal quotations and citations omitted). An agency finding regarding a petitioner's credibility is a factual determination reviewed under the deferential substantial evidence standard, Dia, 353 F.3d at 247, as is a finding regarding a "well-founded fear of persecution." Abdille v Ashcroft, 242 F.3d 477, 483 (3d Cir. 2001) (citing Immigration & Naturalization Serv. v Elias-Zacarias, 502 U.S. 478 (1992)).

An alien seeking asylum under section 208(a) of the Immigration and Nationality Act, see 8 U.S.C. § 1158(a), must demonstrate that s/he meets the definition of "refugee," which is defined as someone who will not or cannot return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); see also Elias-Zacarias, 502 U.S. at 481. The test for refugee status contains both a subjective component, which is satisfied if the fear is genuine, and an objective component, which requires a showing by credible, direct, specific evidence in the record that persecution is a reasonable possibility. Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 430-31 (1987).

The BIA affirmed the IJ's denial of Leia's application for asylum based on its conclusion that Leia failed to present authenticated corroborating documentation under 8 C.F.R. § 287.6 and thus failed to carry his burden of proof. In addition, the BIA, adopting wholesale the IJ's opinion, found that Leia had otherwise failed to present credible evidence.[5] As stated in the

_____

[5] Because it constitutes the "final" agency decision, this court's jurisdiction is to review the BIA's April 14, 2003 order. 8 U.S.C. § 1252. Our precedent is clear, however, that when the BIA

foregoing procedural summary, the IJ's finding of adverse credibility was based primarily on Leia's failure to authenticate his documents pursuant to the regulation set forth in 8 C.F.R. § 287.6, but was also based in part on the two inconsistencies in Leia's oral testimony and the contradiction between Leia's accounts and the Department of State's advisory opinion and 1994 country report on human rights practices in the Ukraine. We turn first to the authentication issue under § 287.6.

**III.**

Section 287.6, the regulation governing authentication, provides in pertinent part:

> In any proceeding under this chapter, an official record or entry therein, when admissible for any purpose, shall be evidenced by an official publication thereof, or by a copy attested by an

---

simply adopts an IJ's decision, we must review the IJ's decision as the final agency decision. See Abdulai v. Ashcroft, 239 F.3d 542, 549 n.2 (3d Cir. 2001). Furthermore, this court has recognized circumstances in which it is appropriate to review both the decisions of the BIA and the IJ. See, e.g., Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004); Miah v. Ashcroft, 346 F.3d 434, 439 (3d Cir. 2003); Senathirajah v. Immigration & Naturalization Serv., 157 F.3d 210, 216 (3d Cir. 1998). In its final order of April 14, 2003, the BIA affirmed the decision of the IJ primarily on the ground that, by failing to comply with the authentication requirements contained in the Code of Federal Regulations, Leia failed to present evidence sufficient to carry his burden of proof. Although it affirmed "[f]or the reasons set forth in the Immigration Judge July 13, 1998 decision," the BIA also set forth somewhat its own rationale and analysis on the authentication issue. App. at 50. In contrast, although the court affirmed the IJ's findings respecting Leia's credibility, it did not discuss in any detail this facet of the IJ's order and rather simply "agree[ed] with the Immigration Judge's conclusion[s]." Id. In such a circumstance, it is appropriate for this court to review both the BIA's and IJ's opinions. Compare Xie, 359 F.3d at 242.

10

> officer so authorized . . . . The attested copy, with
> the additional foreign certificates if any, must be
> certified by an officer in the Foreign Service of the
> United States, stationed in the foreign country
> where the record is kept.

8 C.F.R. § 287.6(b). In affirming the IJ's order, the BIA agreed that this provision is the only mechanism whereby an asylum applicant can authenticate an official record.

In the IJ's first opinion, she interpreted this regulation as requiring her to disregard any documents that were not authenticated pursuant to the procedures set forth in this regulation. App. at 148.[6] On remand, and even after hearing Professor Stavrakis's testimony as to the political situation in the Ukraine which made it impossible to have documentary evidence authenticated, the IJ reaffirmed her prior conclusion that Leia was not credible because of his failure to provide authenticated documents. In fact, as indicated by her comments during the July 13, 1998 hearing, the IJ disregarded Professor Stavrakis's testimony because "that portion of the testimony regarding perhaps political motives that's just as far as I'm concerned just totally irrelevant . . . . It's the regulations that I'm bound by and it doesn't matter what country the person comes from and that's a fact." App. at 67. The BIA affirmed, stating, inter alia, that for the reasons set forth by the IJ, Leia "failed to demonstrate that it would be unreasonable to expect authentication of the corroborating documentation in the instant case." App. at 50.

In our recent opinion addressing the question whether an IJ may exclude documentary evidence from review solely because it was not certified pursuant to 8 C.F.R. § 287.6, we held that "§ 287.6 is not an absolute rule of exclusion, and is not the exclusive means of authenticating records before an immigration judge." Liu, 72 F.3d at 533. We agreed with the government's

---

[6] The IJ incorporated by reference the findings of fact and conclusions of law of her November 7, 1995 opinion into her later opinion of July 13, 1998. App. at 53.

statement in its brief that "'asylum applicants can not always reasonably be expected to have an authenticated document from an alleged persecutor.'" Id. at 532 (quoting Gov't Letter Br. at 3).[7] We held, therefore, that the applicants should have been given the opportunity to prove the authenticity of their documentary evidence through other means. In addition, we explained that because the documentary evidence at issue in that case, if found genuine, would corroborate the applicants' testimony and because the other inconsistencies cited by the IJ, when viewed as a whole, did not amount to substantial evidence that the applicants were not credible, remand was appropriate.

In the case before us, the IJ's interpretation of § 287.6 and the BIA's ultimate acceptance of and approval of that interpretation were made without the benefit of our decision in Liu and are contrary to our holding in that case. As in Liu, the hospital documents proffered here, especially the hospital certificates, if found genuine, would corroborate Leia's testimony regarding the attacks he suffered.

Moreover, we believe that the BIA abused its discretion in approving sub silentio the IJ's decision to reject Professor Stavrakis's testimony regarding the then-current political conditions in the Ukraine and why these conditions made it

---

[7] We further quoted from our prior opinion in Senathirajah v. Immigration & Naturalization Serv., 157 F.3d 210 (3d Cir. 1998), where we stated that:

> It is obvious that one who escapes persecution in his or her own land will rarely be in a position to bring documentary evidence or other kinds of corroboration to support a subsequent claim for asylum . . . . Common sense establishes that it is escape and flight, not litigation and corroboration, that is foremost in the mind of an alien who comes to these shores fleeing detention, torture and persecution.

157 F.3d at 215-16.

difficult, if not impossible, for Leia to follow the processes outlined in § 287.6. Professor Stavrakis has a very distinguished record. He is an associate professor in the Department of Political Science of the University of Vermont, and has been Deputy Director of the Kennan Institute for Advanced Russian Studies with the Woodrow Wilson International Center. App. at 100. At the remand hearing on July 13, 1998, both parties agreed that he is an expert in Ukrainian political affairs. He testified at length, covering some forty pages of the July 13, 1998 transcript, about the impact of the political situation in the Ukraine on Leia's ability to obtain the relevant authentication. He explained that before the documents can be authenticated by the United States Foreign Service, they needed to be certified by the Ukrainian Ministry of Justice and the Ukrainian Ministry of Foreign Affairs. App. at 85. Professor Stavrakis stated that many supporters of the Ukrainian nationalist movement hold positions in civil government and would be unlikely to provide Leia with the required certifications.

We held in Liu that § 287.6 is not the exclusive means to authenticate documents and that asylum seekers must be given the opportunity to prove authentication by other means. 372 F.3d at 533. Leia had the right to present evidence explaining why authentication was impossible and it thus was an abuse of discretion for the IJ to refuse to consider Professor Stavrakis's testimony on the ground that he "had absolutely no knowledge or at the least very little knowledge about the authentication process." App. at 51. That was not the basis for presentation of Professor Stavrakis's expert testimony. Instead, he testified as to the effect of the political situation on the ability of a dissident, such as Leia, to obtain government certification. That was a subject within his expertise. We conclude that this matter must be remanded to the BIA for reconsideration in light of Liu. Of course, we assume that on remand the BIA will direct the IJ to determine the genuineness of the documents, a prerequisite for acceptance of documents that cannot reasonably be authenticated via the ordinary channels.

## IV.

Remand, of course, is appropriate in situations where, as

13

is the case here, a court of appeals has made a legal determination (e.g., regarding admissibility of evidence) that fundamentally upsets the balancing of facts and evidence upon which an agency's decision is based. In such instances, we are obliged to remand to the agency to reconsider and reweigh the facts, rather than attempting to undertake that task ourselves. See Immigration & Naturalization Serv. v. Ventura, 537 U.S. 12, 17-18 (2002); Liu, 372 F.3d at 534. Moreover, in this case the BIA's 2003 final decision "agree[ing] with the [IJ's] conclusion that [Leia] failed to put forth sufficient credible testimony in support of his persecution claim," App. at 50, does not appear to have been based exclusively on the documents that were unauthenticated and excluded, although that was the only issue explicitly discussed by the BIA. Under these circumstances and in order to provide some guidance, we will consider the other bases for the IJ's adverse credibility determination as they may be relevant on remand.

As set forth in our discussion of the facts, the IJ found troubling what she termed two inconsistencies in Leia's testimony which affected her adverse credibility determination. The first inconsistency concerned the date of the second beating. Although Leia initially maintained that the second beating occurred on March 18, 1994, his passport showed that he was in Poland on this date. After this discrepancy was revealed, Leia filed an affidavit explaining that he had not remembered the date he was attacked so he relied on the certificate from the hospital, which was apparently incorrect. App. at 127. Subsequently, he obtained and submitted a corrected version of the hospital record, which confirmed the date of the second attack. Although there is no explicit rejection by the IJ of the affidavit in the record, the IJ may have rejected the affidavit because it was supported only by the corrected medical records which, of course, had not been authenticated according to the procedures set forth in § 287.6. As explained above, rejection on that ground was erroneous. Thus, this inconsistency fails to support the IJ's adverse credibility determination. See also Damaize-Job v. Immigration & Naturalization Serv., 787 F.2d 1332, 1337 (9th Cir. 1986) ("[M]inor discrepancies in dates that are attributable to the applicant's language problems or typographical errors . . . cannot

14

be viewed as attempts by the applicant to enhance his claims of persecution [and] have no bearing on credibility.").

The second inconsistency in Leia's testimony to which the IJ referred concerned the legal status of the UNF. During his testimony, Leia referred to the organization as legal and at other times he described it as illegal. According to Leia, the UNF had applied for legalization, but had not received papers indicating that it was legal or illegal. A.R. 300. Leia explained that because the UNF had never received papers saying it was an illegal organization, he believed it was probably legal. App. at 147. However, during a different portion of his testimony, Leia stated that he could not obtain proof of his membership in the UNF because these would be "'illegal papers.'" Id.

We do not see this testimony as supporting the IJ's adverse credibility determination. What the IJ treated as a contradiction appears to be more reflective of the inconsistencies in the Ukrainian government and its politics than of Leia's credibility. As discussed in the Department of State's profiles and country reports respecting the Ukraine, political groups are required to register with the government. According to the country reports, this registration requirement "lends itself to abuse and bureaucratic manipulation." A.R. 384. The country reports further suggest that whether a group is legal or not is not necessarily dispositive of how the government will actually treat it. Professor Stavrakis's testimony can be construed as supporting a finding that a political organization might technically be legal and yet for all intents and purposes be treated as illegal by the Ukrainian government. Thus, the fact that Leia did not know if the UNF was technically legal or not should not be used to impugn his credibility. Leia could only be expected to know how the organization was actually treated by the government. The IJ apparently failed to consider the testimony and evidence which provided a reasonable explanation of what seemed to the IJ to be an inconsistency in Leia's statements. Furthermore, even if this explanation were found unsatisfactory by the IJ, we doubt whether this one contradiction by itself could support an adverse credibility finding. Cf. Damaize-Job, 787 F.2d at 1337.

15

Lastly, the IJ found that Leia's testimony that he would face persecution throughout the Ukraine was not credible because it was contradicted by the Department of State's advisory opinions and country reports on human rights for 1994. App. at 148. According to the Department of State profile, "[m]any of the problems encountered by applicants from Ukraine are local or regional in nature," and therefore "internal flight would be a logical solution to many frictions." A.R. 377. The IJ held that this profile supported her credibility finding because it contradicted Leia's testimony by "clearly indicat[ing]" that Leia "would in fact be able to reside [in other areas of the Ukraine] without any problems." App. at 148.

To be sure, it is well established that although a showing of past persecution raises the presumption of future persecution, this presumption may be rebutted by a finding that the applicant could avoid future harm by relocating to a different part of the country. See 8 C.F.R. § 208.16 (b)(1)(i)(B); Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004). The burden of proof is ordinarily on the government to prove the feasibility of relocation.

We have recently had occasion to consider the issue of the feasibility of relocation in two decisions. See Gambashidze v. Ashcroft, 381 F.3d 187 (3d Cir. 2004); Berishaj v Ashcroft, 378 F.3d 314 (3d Cir. 2004). In Gambashidze, we stated that in making a determination regarding the feasibility of relocation, a court must engage in a two-part inquiry. First, the court must consider whether the relocation would be a successful means of escaping persecution, and second, whether relocation would be reasonable. Furthermore, a court must view the record to see if "substantial evidence supports the conclusion that [petitioner] could avoid persecution" in one area of his country by relocating to another. 381 F.3d at 193.

We stated that once past persecution was established, there must be significant evidence supporting the government's position that the asylum applicant could avoid future persecution by relocating. In Gambashidze, the only evidence in the record that supported the government's position that petitioner could

16

avoid persecution by moving to another part of Georgia was the seemingly-outdated State Department's 1999 country report on Georgia and petitioner's testimony that he lived at one point for eight months without persecution in Tianeti, Georgia. We held that this was insufficient to show that the government met its burden of proof. Gambashidze, 381 F.3d at 93.

The record in the case now before us is even sparser. There is not even any evidence in the record like that in Gambashidze that once the persecution began, Leia was ever able to live safely in any part of the Ukraine. Moreover, the Department of State advisory opinion and the country reports on human rights for 1994 are too generalized to rebut Leia's specific fear that he would face future persecution if he were to return to the Ukraine.

In the other recent decision, Berishaj, we considered the effect of changed conditions on the feasibility of relocation. We "recognized a limitation on the inferences that may be drawn from evidence of changed country conditions." Berishaj, 378 F.3d at 327. We noted our agreement with other courts of appeals that have held that evidence of changed country conditions can only rebut an alien's fear of future persecution based on past persecution if the evidence addresses "the specific basis for the alien's fear of persecution; generalized improvements in country conditions will not suffice as rebuttals to credible testimony and other evidence establishing past persecution." Id. at 327.

We further noted that "in the troubled areas of the planet from which asylum claims tend to come, the pace of change is rapid – oppressive regimes rise and fall, and conditions improve and worsen for vulnerable . . . minorities." Id. at 329. This court thus suggested that outdated country reports by themselves are insufficient to rebut an individual's fear of persecution and concluded that: "Four-year-old country reports are singularly unenlightening when faced with this kind of situation." Id.

Not only is there insufficient evidence in this record to establish that Leia could live without persecution in other areas

17

of the Ukraine but we echo the concern raised in <u>Gambashidze</u> and <u>Berishaj</u> that the administrative record is "grossly out-of-date."  <u>Berishaj</u>, 378 F.3d at 317; <u>see also</u> <u>Gambashidze</u>, 381 F.3d at 194.  We directed the government to submit a supplemental memorandum to address the relevance of our decisions in <u>Gambashidze</u> and <u>Berishaj</u>.  In its reply, the government maintains that it shares our concerns in those cases and has put in place procedures to deal with the problem.  The government's letter dated September 22, 2004, states that:

> The Director of OIL [Office of Immigration Litigation] . . . notified all OIL attorneys of the factors that they should consider in assessing whether a record is suitable for judicial review.  Among these factors are:  (1) whether there have been pertinent, intervening events in the country of removal; and (2) whether the issues on review are "time sensitive" in that changes in conditions over time may affect the resolution of the issues.  In addition, because OIL's screening of cases should not create a windfall for aliens who have failed to meet their burdens of proof or to pursue the procedural opportunities available to them, OIL attorneys should determine in each case whether the alien bears the burden of proof, whether the alien has made efforts to perfect and preserve the record on his claims through timely motions to the agency, and whether the alien was improperly denied the opportunity to perfect and preserve the record on these claims.  OIL attorneys will consider these factors in all subsequent cases in light of <u>Berishaj</u>.

Letter from Jennifer Keeney, United States Dep't of Justice 3-4 (Sept. 22, 2004) (footnote omitted); <u>see also</u> <u>Ambartsoumian v. Ashcroft</u>, 388 F.3d 85, 87-88 (3d Cir. 2004).

We take cognizance of the government's argument in the same letter that the record in Leia's case does not warrant a remand to the BIA because "the conditions in the Ukraine have

18

not changed in any relevant way as to impact the Court's review." Letter from Jennifer Keeney, United States Dep't of Justice 4-5 (Sept. 22, 2004). It noted that we cannot take judicial notice of the current conditions, but see Pelinkovic v. Ashcroft, 366 F.3d 532, 540 (7th Cir. 2004) (taking judicial notice of changed country conditions), and pointed out that in any event the Ukraine continues to hold parliamentary and presidential elections, albeit with flaws. It stated:

> [T]he current country reports continue to describe incidents of corruption, beatings by police, discrimination, and restrictions on free speech; [but] the reports indicate that the Ukrainian government continues to take steps to address these issues. There have been no pertinent, intervening events in the Ukraine that would inhibit this Court's review.

Letter from Jennifer Keeney, United States Dep't of Justice 5 (Sept. 22, 2004).

Although we appreciate the government's position that we should not pursue a remand because, inter alia, the agency's adverse credibility finding is supported by substantial evidence, we have decided to the contrary as set forth above. We have concluded that we must remand this case for reconsideration in light of our decision in Liu. The admissibility of evidence is crucial to the issue of substantial evidence. We have held, as this court did in Liu, that notwithstanding the deference that we owe to the agency, we cannot sustain the agency's adverse credibility finding which was based in large part on the failure to provide authentication. Perhaps on remand the agency can heed the concerns we recently expressed about stale administrative records in Berishaj and Gambashidze.

## V.

For the reasons stated above, we will grant Leia's petition for review, vacate the final order of the BIA, and remand to the BIA for further proceedings consistent with this opinion.

19